May 25, 1982

Carla LENTE, Commanche, Appellant,

vs.

Louis NOTAH, Appellee.

OPINION AND ORDER

 .

William Shepherd, Esq., DNA-People's Legal Services, Window Rock, Navajo Nation (Arizona) for appellant and the Hon. Patricia Hall, Bayfield, Colorado, for appellee.

## THE CASE BEFORE THE COURT

This is a child custody case in which a Navajo father and a Commanche mother are striving for the custody of their daughter. Carla Lente (plaintiff and mother) and Louis Notah (defendant and father) were married on April 5, 1974. On August 15, 1975 their daughter, Michelle, was born. Michelle is now 6½ years old.

A divorce was commenced by the mother, and on August 26, 1976 the parents entered into a written stipulation that the mother should have custody of the child. That stipulation was incorporated into the court's decree of divorce, entered on October 7, 1976.

When the divorce decree was made, Michelle was just a little over a year old. On February 2, 1978, when Michelle was about 2½, the father made a motion to change child custody, alleging the mother didn't want custody and that she had given the child to him. The motion did not make detailed allegations, and it did not have the verification of the father, as would normally be found in a complaint or a petition. More importantly there was no certificate of service in the motion and there is no evidence in the file of any service of it upon the mother. There is a notice of hearing issued by the clerk of court, dated February 7, 1978, which has a certified mail receipt stapled to it, but there is no return card showing delivery. Another notice of hearing, dated April 6, 1978, was sent by regular mail. On May 10, 1978 the father was given temporary custody of the child.

On June 27, 1978 the mother complained of the temporary order, contending she was not given notification of any hearing and that there should have been a home study prior to a change of custody. The

-72-

following day the court ordered an investigation of the parties and their homes. An initial report was filed by Bi-State social services in July, and after a motion was made to quash the motion for custody change for procedural defects, on October 3, 1978 the court denied the motion, awarded joint custody of Michelle to the mother and father and indicated a final custody ruling would be made when the final reports were in.

Following skirmishes with Bi-State Social Services and the Bureau of Indian Affairs for their failure to make ordered reports, complete reports were submitted. The Bi-State report recommended that the father should have temporary custody, and the BIA report recommended custody in the father as well. Finally, on September 2, 1980, over two and one-half years following the motion to change custody and when the child was five years of age, custody was awarded to the father. This appeal follows that decision.

On appeal the mother attacks the custody order contending:

1. She was not given proper notice of a proposed change of custody;

2. Temporary custody was improperly granted without a proper hearing;

3. There was no showing of a change of circumstances so as to justify a change of custody;

4. Navajo custom requires that she be given custody of the child, since Navajo children belong to their mothers' clan;

5. The social study reports were biased.

The father opposed the appeal making these arguments:

1. There was a full hearing on the merits in the trial court;

2. Any notice errors were related to the temporary order and were cured by the full hearing held later;

3. There was sufficient evidence to support the order;

4. The court heard the evidence of Navajo tradition and properly entered its order notwithstanding such evidence.

The court will confine its decision to the following issues raised by the parties and arising from the record:

1. Was the plaintiff mother given proper notice of proceedings to change child custody by way of service?

2. Was the plaintiff mother given proper notice of the grounds for a change of child custody in the motion?

3. Given the circumstances of the child, most particularly the passage of time, relationships with the father and her age, what is the proper remedy in this case?

4. What is the proper application Navajo traditional law with respect to child custody cases?

NOTICE OF PROCEEDINGS TO CHANGE CHILD CUSTODY

The mother has cited provisions of the Navajo Juvenile Code to support the position she did not receive proper notice, but those provisions are not directly applicable in post-divorce proceedings. She has also cited Arizona statutes in support her position, but we will not reach state law to decide this matter and instead we will rely upon general principles of law which are very basic.

The principle is basic and obvious that "the defendant must be given adequate notice and an opportunity to be heard on the custody

question." Homer H. Clark, Jr., The Law of Domestic Relations in the United States, 577 (1968 Ed.). The general rule of law is:

> "In proceedings for the modification of decrees in divorce relative to the custody of minor children, proper notice to the adverse party and an opportunity to be heard are required, whether or not provided for by statute. An order changing custody, entered without notice, is void and cannot be enforced. An order changing custody, entered without notice, is void and cannot be enforced. Assuming that an emergency exists, the court should not grant an order restraining the custodian from taking the child from the other parent pending an application for a modification without notice to the custodian.
> If the statute on modification does not prescribe any particular type of notice in connection with a motion to change custody, the method of giving notice and the sufficiency of notice must be left to the sound discretion of the trial court. Ordinarily the notice to comply with due process must be reasonably calculated to give the adverse party knowledge of the proceedings and an opportunity to be heard. . . ." 24 Am.Jur.2d, Divorce and Separation, Sec. 817.

The spirit of the kind of notice to be given is summed up in the observation that "a change of custody is just as important to the child and to others as an original award of custody, and the parties should be afforded the same type of hearing on the subsequent application as they are entitled to on an original award." Id.

The notice in this case was hardly calculated to give adequate notice. There was no certificate of service in the motion to show proper notice, and it is obvious from the file that there was no proper actual service. Given the fact that a change of child custody is an event which may severely injure a child and adversely affect the rights of custodial parties, we hold that due process under the Navajo Bill of Rights requires notice to be given in accordance with Rule 3, Rules of Civil Procedure.

## NOTICE OF THE GROUNDS FOR CHANGE

The father contends that any defects in notice were cured by the hearings and proceedings in which the mother actually participated. The mother carefully preserved her rights on this question by objecting throughout the course of the proceedings, and we have already held she was not adequately or properly notified the father would seek a court order for a change of custody. Certainly the later court orders were affected by the first void temporary custody order.

There is also the matter of notice with regard to the court papers asking for a change. As a general principle anyone who asks for a change of an original custody order must show the court there has been a substantial change in circumstances which affect the current custody arrangement. 24 Am.Jur.2d, Divorce and Separation, Sec. 820. There is no set rule about what a substantial change of circumstances can be, but the court must always look to the child's best interests and whether the child's welfare would be promoted by a change. Id.

The father's motion says he was given the child on January 2, 1978, with the mother saying she didn't want Michelle. The motion was filed less than a month later. Changes in child custody are not based upon the wishes of the parents they are based upon the child's needs. The father had the child less than a month, and that was hardly a basis for saying it would be the best thing for her to remain with him. Given the short period of time the child was with him, it might well have been better to return her to her mother, and that may have been the situation but for the temporary custody order, which was void. The motion should have set forth in detail why a change of custody was better for the child and it should have shown facts demonstrating a substantial change of circumstances. The motion simply did not give the mother any basis upon which to adequately prepare for a hearing, and we hold that pleadings to change child custody must conform to the requirements of complaints, in keeping with the idea that subsequent custody hearings are to be of the same nature as the original ones.

## WHAT IS THE PROPER REMEDY IN THIS CASE?

This court is very reluctant to reverse this case given the reports by social work professionals contained in the file. There is every indication the trial court was correct in its ruling and we reverse only because the mother was denied basic rights guaranteed by the Navajo Bill of Rights and common sense. As to the alleged bias of the reports, it appears there was every opportunity to bring any bias to the attention of the court to be cured.

We do not rule on the merits, since that is a matter for a trial court, but we will give the trial court some guidelines for a hearing on remand.

### A. THE TIME PROBLEM

The passage of time is a great problem which affects the determination of a court, and judges must make certain child custody cases are determined quickly and thoroughly.

The passage of time can affect the outcome of a case. One such case was Matter of Adoption of Hall. 566 P.2d 401 (Mont. 1977). There an adoption decree was made concerning a child who was 24 days old. Id. 401, 402. At the time of the adoption the mother was a minor, and she was not given notice of the adoption hearing and did not consent to the adoption. Id. 402. Five years after the adoption the mother discovered who the adoptive parents were, and five months after that discovery she brought suit to void the adoption and regain custody of her child. Id. The trial court upheld the adoption, and at the time the child was seven years of age the case reached the Montana Supreme Court.

As it was in this case, the mother did not receive notice of the proposed child custody proceedings. Id. The court said the decree was not only invalid for that reason, but that it was void for all purposes. Id. In the face of arguments that there were factors which would somehow validate the otherwise void decree the court quoted a ruling of the United States Supreme Court that:

"A judgment void when rendered will always remain void. The validity of every judgment depends upon the jurisdiction of the court before it is rendered, not upon what may occur subsequently." Id.

In the Hall case the trial court held a full hearing concerning the "best interests of the child." Id., 403. The trial record before the Montana Supreme Court shows there was expert testimony by a psychologist and a child welfare social worker on the effect of child's time with the adoptive parents and her relationship with them, and time was relied upon by the trial court in upholding the custody of the child by the adoptive parents. On appeal the Supreme Court said:

"We cannot quarrel with the court's conclusion as to the best interests of the child. The transcript reveals the case was throughly investigated by the county welfare department and its report was aired with equal throughness at the hearing. There is an abundance of substantial credible evidence to support the court's conclusion." Id.

Using the best interests standard, although the Supreme Court held the adoption to be utterly invalid and void, it awarded permanent custody of the child to the otherwise adoptive parents. Id.

This case demonstrates the fact courts will look to the welfare of the child before the rights of a natural parent. Where necessary the courts will give custody of a child to someone other than the parents because of the child's relationship to them, even where there is no fault on the part of the parents. In Deer v. Okpik the Family Division of the Superior Court of Quebec gave physical custody of a child to his grandparents because of his relationship to them, cultural integration into their Inuit (Eskimo) society and an adoption under Inuit custom. (1980) 4 Canadian Native Law Reporter 93 (Cour superieur de Quebec, 1980). There it was held that the dominant principle guiding the court is always the interests of the child. Id., 96.

Courts are carefully accepting the theory of child psychology that a child taken from an established home can suffer from the effects of "parental deprivation." See, "Natural v. Adoptive Parents: Divided Children and the Wisdom of Solomon," 57 Iowa L. Rev. 171, 174 (1974). "Parental deprivation," the separation of a child from an established home, can lead to:

"An inability to relate and form meaningful relationships with others which may manifest itself on a broad continuum from severe anxiety to deep depression." Id., 176.

One result of not considering the child's relation to his or her home can be immaturity and delinquency. Id. 171, 176-177. Therefore it has been urged that courts adopt a "strong presumption" in favor of leaving a child in the home he or she knows, regardless of biological or blood ties to a parent. Id. 171, 179.

The basis for this principle is of course the findings of child psychologists. Since the best interests test is one based upon facts, scientific findings must be used in the child custody field of law.

Recent psychology texts have noted that if you break up a child's relationship to an established home and people who the child sees as the real parents, there can be feelings of abandonment, an inability to trust, difficulty in forming deep relationships with people and a real possibility of creating antisocial behavior. Committee on the Family, Group for the Advancement of Psychiatry, New Trends in Child Custody Determinations, 90-95 (1980). Because of this potential problem, child psychologists are strongly recommending that once a child has been placed in a home, formally or informally, the courts must leave the child there. Id.; Joseph Goldstein, Anna Freud, Albert J. Solnit, Beyond the Best Interests of the Child (1973).

This is not to say that if a parent or someone else obtains physical control of a child that the court should legalize that relationship just because of the passage of time. See dissent, Matter of Adoption of Hall, 566 P.2d 401, 403-405 (1977). The guideline we give the trial courts is that where a child has been living in one home for a long period of time, the court should not disturb that situation except for the most serious reasons, and should presume that situation is in the best interests of the child unless factors such as those found in the case of dependent and neglected children are present. See 9 NTC Secs. 1002(q), (r). We do not rule that children taken out of a legal home or from the legal custody of a parent can be later kept legally just because of the passage of time. Where a child is taken from a natural parent there are the remedies of the civil law of habeas corpus or otherwise to get the child back, and any such taking is a crime. 17 NTC Sec. 312. However in extreme cases, such as this one, the passage of a long period of time and the establishment of a firm relationship with the person or persons having actual physical care of the child can be a ground for legally confirming that relationship.

We do not prejudge this case and we remand it to the trial court to consider this factor on the basis of the evidence and expert testimony. The trial court may confirm custody in the father because of the time element alone or it may consider an alternative being used in other courts in the United States. That alternative is to order full access to the child by the non-custodial parent and, if the access and relationship with the child is successful, the court can order a gradual transition to the full custody of the parent who has been deprived of custody of the child. Either process of course must be done with a great deal of care and the advice of professionals who know child welfare principles.

## B. THE RECORD BELOW

Again, we reverse this case because of lack of actual notice to the mother and deficient notice of allegations showing a substantial change in circumstances. We cannot do otherwise. However we do note that the reports made to the trial court by child welfare professionals raise some very serious concerns regarding the welfare of the child. We cannot overlook those concerns, and we will order an immediate and careful hearing on the merits of custody. We will order that immediate arrangements be made for thorough and quick home studies of the two parents, and we will order a speedy hearing on permanent custody. We will also order the trial judge to carefully review the prior studies and

require that their findings be brought up to date and we charge the trial judge to give both parents full opportunity to cross examine the individuals who prepare the reports.

We order a quick hearing because of the pain and anxiety of the parents and the child when things are left hanging up in the air. Child custody proceedings are among the most painful events in the life of a parent or a child, and this case has dragged on long enough.

We order and require that immediate child welfare studies be done by professionals because there are extremely serious matters in the record of this case which must be re-examined for the protection of the child and the reputation of the parties.

## C. GENERAL GUIDELINES

It is appropriate for this court to give some guidelines and factors to the trial court here and to all the Courts of the Navajo Nation to be considered concerning the custody of a child. Some of the recommendations are based upon factors discussed above, some are based upon the policies contained in 9 NTC Sec. 1001 (Juvenile Code) and 9 NTC Sec. 605 (adoption policy) and others are based upon the factors discussed in the excellent article, "Child Custody Litigation," 22 Am.Jur. Trials, 347-516. These are the factors the courts must weigh in custody situations:

1. The actual living or family situation of the child;
2. Encouragement of the Navajo cultural upbringing of the child;
3. Navajo custom and tradition, where appropriate to the case;
4. The child's tribal enrollment situation and tribal benefits;
5. The time the child has been in its present home;
6. The ages of the child and persons who desire custody;
7. Employment of the parties and income;
8. Whether the individuals are absent from the home frequently;
9. Arrangements for caring for children during absences;
10. Dates of separations from the child;
11. The date of divorce or the initial custody order;
12. Prior divorces of the adults;
13. Previous or present romantic or sexual involvement of the adults, including whether it happened while or while not married, and whether the child was aware of the involvement, whether it occurred in its presence and whether the involvement affected the child in any way;
14. Acts of cruelty, desertion, neglect, desertion or non-support toward the child;
15. The relationship of the child with brothers and sisters or other children;
16. The physical and mental condition of the child, including past and present illness, prior treatment history and hospitalization;
17. The school history of the child, where applicable, including the child's behavior, performance and grades;
18. Any history of connection with social welfare agencies, including the reason for the connection and the findings by those agencies;
19. Any behavior problems of the child, including emotional

problems or physical disabilities;

20. Juvenile Court history of the child;

21. The observations of neighbors and relatives about child's situation;

22. Contact and observation by clergymen or the child's friends or adults who come into contact with it (e.g. social organizations, pow-wow activities, scouting);

23. The relationship to the paramour (lover) or new spouse of a party to the child;

24. Condition and environment of the home and neighborhood of the parties;

25. The emotional stability of the father, mother and other individuals directly connected with the child including, where it appears necessary, current psychological examinations and a review of past contacts with psychiatrists, psychologists and mental health workers;

26. The education of the parties;

27. The religion of the parties and their relation to the religious training of the child;

28. The race and culture of the parties;

29. The drinking and drug use habits of the parties as they might affect the child;

30. The criminal history of the parties and individuals directly affecting the child, including the nature of offenses and time they occurred;

31. The desires of the child as to who he or she wishes to be with;

32. Prior agreements of the parties as to the child's custody;

33. The arrangements the parties have made for the financial welfare of the child, including wills, trusts, savings accounts or insurance policies;

34. The reasons of the parties (preferably given to the court in writing) why they feel they would be the best person to take care of the child and why the other party would not.

As was noted above, there are no fixed standards on what constitutes a substantial change of circumstances. The same is true with the "best interests of the child" test. The trial judge must be ever alert and must be prepared to consider many competing factors in child custody. It is helpful for the trial judge to use the checklist set forth above, because only a complete view of all the circumstances surrounding a child will give the court some guidance on how to rule. It should be remembered that these factors should also be used by the court in drafting findings of fact for judgments and decrees.

THE APPLICATION OF TRADITIONAL LAW TO THIS CASE

The mother has raised the point that since a child is a member of the mother's clan under Navajo tradition, that should be a basis for a ruling in her favor. She of course found her argument on 7 NTC Sec. 204, which mandates the use of Navajo customs and usages where they are not in conflict with specifically applicable federal law or tribal statutes. The danger in using Navajo custom and tradition lies in attempting to apply customary principles without understanding their application to a given situation. Navajo custom varies from place to

place throughout the Navajo Nation; Old customs and practices may be followed by the individuals involved in a case or not; There may be a dispute as to what the custom is and how it is applied; or, A tradition of the Navajo may have so fallen out of use that it cannot any longer be considered a "custom."

What is a custom? It has been said to be practice and not an opinion. John Chipman Gray, The Nature and Sources of the Law, Sec. 606 (1916 Ed.). "Custom is what men do, not what they think." Id. (Emphasis in the original). Custom is the practice or regular conduct of members of a group of people, acting in a certain way. Edwin W. Patterson, Jurisprudence: Men and Ideas of the Law, 224 (1953 Ed.). Since the courts are currently undertaking a complete study of how to use Navajo custom and tradition we will not decide that question here, but the obvious concern is that when applying custom the courts should see whether a particular custom or tradition is generally accepted and applicable to the parties before the court.

Relatives are important to the Navajo child. One noted writer has said of that relationship:

> "The importance of his relatives to the Navaho ( sic. ) can scarcely be exaggerated. The worst that one may say of another person is, 'He acts as if he didn't have any relatives.' Conversely, the ideal of behavior often enunciated by headmen is, 'Act as if nobody were related to you.'" Clyde Kluckhohn and Dorothea Leighton, The Navaho, 100 (Rev. Ed. 1974).

Thus the Navajo child fits into an atmosphere of family and relatives.

The mother has stated the general customary law correctly. Traditionally the father and child lived with the mother's family, and the child was said to "belong" to the mother's clan. Id., 103, 112. When a visitor came, the small children would stay close to their mother. Id., 90. While the child belonged to the mother's clan, it was said to be "born for" the father, and a child might say "'I am Bitter-Water, born for Salt.'" Id., 112.

Another observer of the Navajo specifically discussed the effect of divorce. Gary Witherspoon, Navajo Kinship and Marriage (1975). He says:

> "When divorce occurs between a couple living matrilocally, the husband returns to his mother's unit, and the wife and children remain. The same is true in the leadership generation, although divorce is uncommon at the leadership level.
>
> * * *
>
> When the divorce occurs in patrilocal residence, the wife and the children return to the mother's unit. The husband of course remains." Id., 75-76.

Translating Witherspoon, he says that when there is a divorce and the couple is living with the wife's family, the husband goes back to his mother's family and the wife and children remain with her family. When

there is a divorce and the couple is living with the husband's family, the husband stays where he lives and the wife and children go back to the wife's family. There are exceptions to this general rule, of course, but they are said to be rare and that they must be approved by everyone concerned, especially the head mothers. Id. 76-77. There are a very logical reasons for this Navajo tradition. When families live with the wife's overall family, death and divorce do not affect the living arrangements of the family in the same way as families living with the overall family of the father. Id. 77.

While this is a general statement of Navajo custom and tradition, the question is whether it applies to a Commanche mother and a Navajo father, who may or may not expect the customary law will apply to them. The solution to this problem lies in the courtroom. Whether parties expect tradition to be applied will come out in testimony, and the Navajo Tribal Council has very wisely provided that judges may take care of any doubts they have in using custom and tradition by requesting the advice of "counsellors" (most likely medicine men or elders) on the matter. 7 NTC Sec. 204(b).

Because the courtroom is the place to make the determination, the trial judge is in the best position to apply customary law. In this case the trial judge heard sufficient testimony on the customary law of child custody, and he was in the best position to apply it. The Navajo customs and traditions of where a child lives are but one of the many factors to be considered. (See above). Since custom is but one of the many factors, a trial judge may be justified in disregarding old ways, and this court will not overturn such a decision unless it was clearly an abuse of discretion.

The question is how the Navajo courts should use custom as law. This matter is under study and we will make no definitive ruling on that question at this time. However it should be noted that the application of custom depends on a good many circumstances and all the facts of the case. The trial judge in Deer v. Okpik, above, carefully determined all the facts and circumstances before making a ruling founded upon Inuit custom, and that appears to be the proper procedure. That is exactly what the trial judge did in this case, and we see no reason to overturn his decision for failure to strictly follow custom and tradition.

ORDERS

Based upon the considerations discussed above, it is hereby ORDERED THAT:

1. The judgment of the trial court is reversed and this cause is remanded to it for proceedings consistent with this opinion;

2. Upon receipt of this order and its filing in the record of the District Court the Trial Judge shall immediately order comprehensive studies of the situation of the parties and the child, along the lines discussed above and in accordance with the expertise of the agency conducting the studies. The court shall choose an agency which can quickly and competently conduct a study, taking all prior reports into account, and the report shall be presented to the court within 20 days of the order requiring it;

3. Counsel for the parties shall be notified of the filing of the

report and shall inspect it only in chambers in the presence of the judge. Counsel may take notes from the report but may not receive copies of it;

4. Within 10 days of the report counsel shall submit a pretrial order for the approval of the court, and such proposed pretrial order shall contain:

a. A statement of agreed facts which require no proof;

b. A statement of the contentions of the parties showing the theory of their case, including proper court orders regarding child custody, visitation and support;

c. Any law problems which the parties desire to raise and a plan for submitting briefs upon them;

d. A list of exhibits to be offered by the parties, including an indication of which exhibits are agreed to, which exhibits are objected to, and the grounds for any objections. Copies of exhibits will be exchanged;

e. A list of the names and address of each witness a party intends to call;

f. The length of time the parties feel is needed for the trial of the cause.

5. All experts preparing reports for the court shall be witnesses of the court and shall be compelled to attend the trial by subpoena.

6. The trial of the cause shall take place no later than twenty day from the date of the ordered submission of the home study report and a decision on the cause shall be rendered no later than 10 days from the date of trial;

7. This court shall consider an expedited appeal from any decision of the trial court.

8. The court shall consider the full history of the relationship of the parties with the child in making its custody determination;

9. Pending the decision of the court, the defendant father shall have temporary custody of the child, with reasonable visitation rights in the plaintiff mother, subject to the control of the trial court.